Just for my administrative purposes, are you Ms. Liz Reardon? Yes, I am. Okay, and you're the only one who's representing the objector here. That's correct. How many counsel on the other side do we have that will be speaking today? Your Honor, Tracy Lorenz and I arrived a bit late. I got lost, so I'm not sure I'm checked in, but I brought some business cards, and I'll be speaking on behalf of the class. Mr. Antia and Mr. Leon will be speaking on behalf of Coverall and Perry. Okay, are you splitting 15 minutes on your side? We're splitting 15 minutes. Okay, all right, okay. As long as everybody understands you have 15 minutes total, and you've worked it out among yourselves, we're fine with that. I just want to make sure that we don't have any misunderstandings. Okay, thank you. All right, counsel, you may proceed as ready. Thank you. Good morning, Your Honors. I'm Shannon Liz Reardon. I represent the objector appellant in this case, Amrit Singh. I would ask the Court if I could reserve four minutes of my time for rebuttal. Thank you. Just by way of background, Your Honors, I feel like I should begin this by saying that I have no interest in this case. I am a class action litigator who has spent my career representing workers in workers' rights cases, and I have no interest in this case. I have no interest in representing a class in this case. The only reason that I am here is because I'm representing this objector because in my 15 years of practice, I have never seen a settlement so outrageously unconscionable as the one that was approved in this case. This settlement is an abuse of the class action process, and I'm here representing this objector because this approval undermines the integrity of the class action process, which I believe is an extremely valuable tool for protecting workers' rights. Now, the settlement that was approved in this case involved a monetary payment of approximately $56,000 to class members, an attorney's fee of approximately $1 million. That means that the fee was approximately 18 times size the cash recovery to the class. $56,000 was not, that wasn't a negotiated figure, was it? That's sort of a redemption, that's sort of an estimate of what the redemption value will be, according to the number of class members who came forward, but the potential liability was much larger than that, was it? Yes, that's correct. What was the potential liability? The potential liability or the potential size of the settlement payment. Well, I'm interested in knowing, had everybody come forward that we thought was in this class and requested this, how much would the payment have been? I don't remember the number offhand. I know it's in the record. I believe it was more on the order of several hundred thousand, but I'd have to check to be certain. I believe there was a very low response rate. Of the 1,500 class members, 119 submitted claim forms. Of the 1,500 class members, approximately half were eligible for a cash payment of $475, and half were not. Did the parties know that coverall would only be liable for roughly $56,000 at the time that they created the settlement? The time they created the settlement, they didn't know specifically how many would claim. They set up a process by which notice was sent to class members spanning an approximately eight-year period back. So they had old addresses. Class members had 30 days from when these notices were mailed to submit objections or opt out, and they had a 45-day period to return a claim form in order to collect their $450 or, I'm sorry, $475. So although and among the many problems with the settlement is there was a reversionary clause, meaning that any class members who did not submit a claim form within this 45-day period, that money would revert to coverall and it wouldn't be paid out. So although the parties had no way of knowing exactly how much would be claimed, the process was structured so as to it should have been known that it was going to be a very low claim rate. And, in fact, only 119 class members out of 1,500 class members, in fact, became eligible for the nominal $475 payment that was provided for in the settlement. Was there any indication in the record that getting a high response rate would be problematic in this case, either because of the length, the age of the class, or the nature of the class, the demographics, anything else? Well, there was a lot of discussion about that at the fairness hearing. I mean, and I tried to explain to the district court judge, based on my experience in administering settlements of this very type, all of the processes that have been used and that can be used to ensure greater participation. The court, however, relied on what the parties said, that claims rates just are low when you have a transient immigrant population comprising a class. And, unfortunately, there's not very much we can do about that. There's a lot more that can be done about that. And that's personally what I do when I settle cases of this sort in extensive outreach efforts. Okay. What should have been done? What should have been done? Yeah. Well, first of all, there never should have been a settlement in which the claim, even if a claim was submitted, it would come to $475 given the actual values of the claims. But we can come back to that point. If the question is what could have been done to administer the settlement so that more class members would have actually received their nominal $475, there could have been an extended period to submit claim forms. Typically, in many cases that I have settled of this nature, class members are given six months or even a year or more to submit claims. And we make multiple efforts. We do follow-ups. We make phone calls. We search for addresses. And even after a settlement is approved, it is often worked into settlement agreements, and this is how our firm settles cases, is that class members who find out about the settlement late and still want to participate can still submit a claim form late. So it's not cut off as of the time of the hearing or something like a 30- or 45-day period. When you're talking about a large class of this sort that spans back many years, and particularly when you have many immigrant workers, many of whom are going to be hard to track down, it's unrealistic to expect you're going to get any kind of real participation rate in a 30- or 45-day period. Was coverall in bankruptcy procedures at the time? No. No, not at all. Not at all. And there's evidence in the record regarding coveralls. Again, I don't have the numbers off the top of my head, but I believe gross revenue is on the order of $300 million a year annually. There are also other defendants in this case who were released under the settlement agreement that are quite in robust financial health, Aries and Allied, who were funding coverall and have capitalization, I believe, in the billions of dollars. So although there was some talk about coverall's financial health, there was no real evidence put forth that such a settlement was necessary because of the potential insolvency of the company. Jumping ahead to some of the other points. Yes. Before you do that, were there other provisions that you think should have been negotiated? Well, first of all. You object to the actual value of the claims. Those are the $475. You object to the extended, to the lack of an extended period for redemption. Are there other terms that you think are unconscionable here that should have been negotiated differently? Well, really what's unconscionable here is having the claims, serious claims of 1,500 class members wiped out for virtually nothing, other than a handful getting this nominal payment. And the justification for that by the plaintiffs essentially was, well, look at all of the challenges that we had in this case. And I can address those. Those challenges, while I admit they were there, I don't believe they're insurmountable, but the point is is that if plaintiffs are concerned that a case is not going to be certified as a class action because they had particular concerns over the arbitration agreement and the Supreme Court's jurisprudence from the Concepcion case, if the plaintiffs were concerned that they weren't going to be able to recover a sufficient recovery because of the financial health of the defendant for a class of 1,500, the answer was not to reach a settlement that releases the claims of 1,500 people for virtually nothing, pays the attorneys a million dollars in fees. The answer there, if that were the case of class certification where the Plaintiffs' Counsel was convinced there was no way class certification was going to be had, the answer would have been not to settle on a class-wide basis because the class members would be in better shape, it would be in the interest of these class members who had their claims wiped out for really nothing to have those claims out there, meaning that those who were by some mean or measure able to find themselves in a lawyer's office one day looking into how they might be able to pursue their claims in this case, they would have claims that they may be able to pursue, even if they had to do it individually. And in the record, we have the portions, the excerpts of Coverall's franchise disclosure, which explains what amounts it has settled these types of individual claims for around the country, and they're in the $3,000 to $50,000 range. And the handbook for the Federal Judicial Center puts out a handbook, a pocket guide for Federal judges in considering and approving class action settlements. And one of the things that's noted in our papers that's recommended in that handbook for courts to undertake their own inquiries into the values of the claims, because often the settling parties are not going to be extremely transparent with the court about what the values of those claims are. And one of the ways that this pocket guide recommends that judges look at the value of the claims is seeing what other similar claims, even settled individually, have been worth. So. What about the non-monetary part, the assignment, which potentially could be quite a significant benefit? Tell me that. What's wrong with that? Okay. Well, I do want to address the assignment portion. First of all, I also want to note in the Bluetooth, in-ray Bluetooth decision from the Ninth Circuit, the court has made very clear that settlements involving, I'm quoting, involving non-monetary provisions for class members deserve careful scrutiny to ensure these provisions have actual value to the class. In this case, I tried to explain to the district court why this purported non-monetary benefit was no benefit at all. And I have not intimate knowledge of this company and how it operates, having litigated against it in other litigation for eight years now. There are three primary reasons, and the court really simply just disregarded them. First of all, the assignment, whatever assignment means, is not defined anywhere in the settlement agreement. There was lots of discussion by the counsel at the hearing about all of these great benefits of assignment and how naturally having accounts assigned to them would mean so much for the workers. There's no definition in this lengthy settlement agreement about what assignment even means. Secondly, whatever it means, say it was beneficial, although I see no benefit because I see absolutely no change. Even if there was an assignment, there is no actual change in the way the process would work for the workers. Same thing would happen the next day, even if they had their assignments, their accounts assigned to them. They pay fees to work. They do work. They get checks from Coverall that deduct all kinds of expenses and insurance deductions, et cetera. They have to pay fees if they want to get additional work. There's nothing about the assignment that changes the overall operating relationship between the workers and Coverall. But third of all, even if I'm wrong on both of those two points, the agreement itself says that in order for an assignment, for a worker to even get one of these assignments, they have to have paid off all of their fees to Coverall. And I tried to explain to the district court that that often never happens, because what the company does, it operates by collecting these fees from these workers, and oftentimes they're financed over a two- or three-year period or even longer. The workers often leave very quickly because they start to realize it's a scam, that they're not getting the jobs that they were promised, that the jobs are so underbid they can't afford to do them. And in my experience, my knowledge of how this company operates, many workers never pay off these fees. I asked the court to inquire how many workers would even be eligible for these assignments, how many have even paid off their fees. We got no answers to that. The court did not inquire into that. So there's no evidence in the record that, first of all, I tried to explain in detail why this assignment was meaningless. Secondly, even if the assignment meant something, it wasn't even defined in the agreement. And third of all, even if it had some meaning that somehow we're just supposed to speculate really did have some value for the class, there was no evidence in the record as to how many class members would even benefit from such assignment. Thus, the court completely abandoned its duty to inquire into the value of a non-monetary benefit. And then also just another thing I want to quote quickly from the Bluetooth decision is, the court then justified the fees based on saying, well, there was a lot of work done in this case, and the counsels say that really their lodestar time came to 3 million. But I'd say 1 million seems fine because even if the settlement were only worth 4 million, but just pulling that number out of the air, that comports with the benchmark. But the Ninth Circuit said in the Bluetooth case, just as the lodestar method can confirm that a percentage of recovery amount does not award counsel and absorb an hourly rate, the percentage of recovery method can likewise be used to assure that counsel's fees does not dwarf the class recovery, which is exactly what happened in this case. And I just want to note briefly, and I did want to save some of my time for rebuttal, but the recent Radcliffe case that Judge Gould authored reversed a class action settlement solely on the basis of there being a disparity between the incentive payments the lead plaintiffs would receive and the class members. In this case, that disparity was strikingly here, but quite frankly, that is such a minor issue comparatively to all of the problems in the settlement, it barely was even worth mentioning. But I just wanted to point that out. I do want to save some of my time if I'm going to be allowed to, but I just want to say that there is so much in this record. I really urge the court, and there are plenty of accusations against me personally, accusations against the objector. I believe the responses are laid out in the papers, particularly if the court would read the underlying objection, the transcript of the fairness hearing, even the deposition of the objector, which we objected to objectors having to be put through that type of harassment and deterrence. And I just want to wrap up here by saying that, again, I am a believer in the importance of the class action process and its use for protecting workers' rights. This case, this case stands for the proposition that the class action process, the integrity of the class action process would just simply be undermined to allow a settlement of this nature to be approved and to stand. Thank you. Thank you. Good morning, Your Honors. My name is Tracy Lorenz. I represent the class. I'm going to split my time with counsel representing the various defendants in this case. Let me start by saying that the objector's counsel's arguments completely miss the significance of the settlement in this case. This case was settled primarily in an attempt to get the customer accounts into the hands of the franchise owners. So this is a case where we've got franchisees buying a franchise from Coverall. When they bought the franchise from Coverall, under the original franchise agreement, they did not own the customer accounts. That is what, in my opinion, gave rise to all of the problems. So when Ms. Liz Reardon references the scam, what she's talking about is what we talked about as churning in our case, which arose from the fact that the franchise owners could not deal directly with their customers. So in essence, the way I see it is that what we got these franchise owners was instead of the right to work, they now have the right to be independent business owners. And because of that, all of the wage and hour violations go away. Because as independent business owners, issues about meal and rest breaks and unpaid overtime become irrelevant. Let me just quickly address the benefits of this settlement. Can you explain what the relationship is under this assignment provision? What is the relationship between the franchise owners and Coverall that's different now? What actually happens? What actually happens is it's a complete sea change. Coverall has to completely rewrite the franchise contract. Currently under the franchise contract, they own the customers. They have all the interaction with the customers. So they bid the accounts. They supervise the accounts. They negotiate with the person who's building their cleaning, what hours they'd like to have them cleaned, et cetera. Now the franchise, or if this is affirmed, the franchise owners will own those customers. So they will have the ability to bid the accounts, set the schedules, do all the things that an independent business owner could do. And those are significant rights. And the payments go directly to the franchise owner, not through Coverall? No. As with any franchise, I'm not aware of any franchises where the payments go straight to the franchisee. That was one of the novel issues in this case is franchise law being harmonized with employee-employer law. But I don't know of any franchises where Mr. Leone can address this further because he's a franchise attorney for Coverall. But as far as I know, you always pay to the franchisor. They pull out their royalty, and then they forward it on to the franchisee. And I believe that that system will still occur. What really has changed here is no more scams, no more churning, because now these franchise owners deal directly with the customer. So if the customer, for instance, doesn't pay their bill, it used to be that the franchise owner would still have that deducted from what they got from Coverall every month, the fact that that person didn't pay their bill. They now own these customers. They can cancel that account if the customer doesn't pay. So there are significant benefits here, which the district court explored. It gave heightened judicial scrutiny to under Bluetooth and found to be of significant value. What about the question that was raised that in order to effectuate this assignment or make it unconditional, you have to have paid your account in full in the representations. Many franchisees aren't in that situation. What's the numbers? How do we know what the numbers are? One of my difficulties here is responding to a lot of representations that have absolutely no basis in the record. There's no evidence at all. So as far as I know, the franchisees cannot finance their franchise for more than three years. So this case started in I believe it was 2008. We went up on appeal in 2011. Mr. Leone can address it maybe more specifically, but I would guess that the vast majority of the franchisees own have paid off the cost of that franchise. Is that in the record?  I can't recall, sir. Wouldn't that be rather important for a judge in assessing the adequacy and fairness of a settlement to know whether it's 99% of the people are going to get this benefit or 2% of the people or somewhere in between? 100% of the current franchise owners are going to get this benefit, and here's why. As soon as they pay off their account, if it hasn't been paid off yet, they will get this benefit. Yeah, that's what I mean. As soon as they pay off, what is the current state and how many have the wherewithal to pay it off immediately? What is the situation on the ground? That's what I'm asking. Well, I am going to let you ask Mr. Leone the exact percentage, but I do know that it takes three years max to pay off your franchise and that this case started in 2008. So I would have to say the vast majority, but here's where I disagree with you, Your Honor, is that I still think that 100% of the current franchisees obtain the benefit of this settlement because as soon as they pay off their account, if they haven't already, they get the assignment. So, for instance, if I go out and buy a new car, I'm not going to be able to go to a bank and get a loan against the equity in that car until I've paid my car off. Or if I buy a new house, I'm not going to be able to go sell it to somebody else until I've paid the person that sold me the house. So I don't see it as anything that's unusual or odd. They've got to pay for this franchise before they own it. And as soon as they own it, they really are going to own it under this settlement. They are going to own it. Counsel, Judge Gould, if I could ask you a question, please.  I didn't really understand the way you framed the franchise. And maybe your co-counsel will explain that to me. But let's say one of these franchisees had the contract to clean the federal courthouse here that was given out by GSA. They clean the courthouse. Who does the GSA pay? Does it pay the franchisee or does it pay Coverall? Well, I believe the check would go to Coverall, and Coverall would then pay the franchisee. But there aren't any allegations that Coverall then kept the money and didn't pay the franchisee. Because Coverall does deduct a royalty, as do all franchisors. Right, but a lot of franchise agreements, unless this has changed a lot since my practice, would provide, like the franchisee collects money from the public and pays a royalty to the franchisor. Let's say a McDonald's restaurant. You know, you go in and buy a McDonald's hamburger, you don't pay McDonald's, and if it's a franchise, you don't pay the national McDonald's company, you pay the money to that restaurant. You're probably correct, Your Honor. And I think I would be smart to let Mr. Leone address that specifically, because he's a franchise attorney and represented Coverall. My assumption is, is when you go to McDonald's, you need to pay for your hamburger as you get your hamburger. And so for that reason, they handle it that way. But I would be more comfortable not speculating about that. Let Mr. Leone address that specific question. That's fine. Okay. Thank you, sir. Counsel, you're down to less than seven minutes. I don't know how you're dividing that up. Right. So let me just quickly hit two things that are very important to me. The former employees, or the former franchise owners, excuse me, the $475,000 in cash was found to be adequate alone by the district court, and that's at AER volume 1, page 30. The $750,000, the district court said exactly this. The coupon serves, the $750,000 I saw as a purchase credit, and I think it has more value than a coupon because it vests an ownership interest. So I think it's more valuable than a coupon. But we don't need to argue about whether it's a coupon or not. The district court called it a coupon and said the coupon serves as an additional award. The coupon's existence on top of the cash recovery should not prevent the settlement's approval. That's at volume 1, page 30. In my opinion, that means that what the district court did when it awarded attorney's fees, and keep in mind those attorney's fees included all of our costs, which exceed over $100,000, and it didn't include any of the times since the order in 2011. But what the district court did was it went right down 28 U.S.C. 1712. It found this to be, I'm sorry, I shouldn't say it found it to be, but it's very clear that what the court did was looked and saw we fall right under 1712B because the settlement included monetary and non-monetary relief. The court applied a lodestar. It looked at our fees. It saw we had 4,500 hours of time. It found the time was credible. And it found that we voluntarily agreed to reduce our fees by 70%. It would have been $3 million without any kind of multiplier to facilitate the settlement. I think that's totally in accordance with this circuit's decisions under Hanlon, under Bluetooth, under HP, under 1712. It was an appropriate way to have analyzed the attorney's fees. And so with that, I would like to give the counsel that represent Coverall and the other defendants a chance to speak. Okay. Thank you. Good morning, ma'am. Please, the court. Norman Leon for Coverall North America. Your Honor, this is a couple of points I'd like to address quickly. I do want to follow up on Justice Gould's question. Under a typical product service franchise, the franchisee is going to get the money directly, and royalties are going to be paid to the franchisor. But the fact that monies are paid to Coverall here directly, which deducts the fees that's due under the franchise agreement and forwards the balance to the franchisee, isn't unusual. It happens not only in the janitorial industry. It happens in the staffing industry. It happens, in fact, in most franchise industries where franchisors have national accounts. Even a company like Edible Arrangements, for example, the car rental companies, the hotel companies, if there's a national account, the money from those accounts is going to be forwarded to the franchisor, who's going to deduct his fees, and the franchisor is going to forward the balance to the franchisee. That is part of the thing. Okay, so you do it that way. With a national account, the money goes to the national franchisor, but like with a dry cleaner or a restaurant, it goes to them, right? That's correct, Your Honor. That is the way it is typically done in a product distribution franchise, like you mentioned, a dry cleaner or a restaurant. I will note that that is a function of the franchise agreement. That was not challenged in the lawsuit and has remained as part of the party's relationship going forward. I want to correct a couple of things that the Objectors' Counsel noted. First, as it concerned the redemption rate, the $475 payment, which came to about $380,000 in total, was a payment that was offered to the franchisees that were former franchisees. That was a group of about 807, so the redemption rate on that was actually about 15%. There was an allegation raised that the class members would have been better off prosecuting these claims individually. I think as a matter of practice, that simply does not happen, and I think that the Objectors' Counsel knows that full well. The Objectors' Counsel filed an identical suit against one of Coverwell's competitors in the Northern District of California. Judge Conte denied class certification on these identical claims in January of 2011. That is nearly three years. We've checked the records, Your Honors. In the nearly three years that have passed since then, not a single suit has been filed by any Johnnie King franchisee against Johnnie King since class certification was denied. So I don't think it's realistic to say they would have been better off going and prosecuting these claims individually. Counsel, that's probably what you just said may well be true, but I'd be surprised if that was in the record. This Court can take judicial notice of the public filings in the federal court system, and we've searched that, and I can represent to the Court that there is not one that's been filed. And this issue was raised, in fact, in front of Judge Miller when the exact same argument was made to him, and he rejected it, so it is in the record, Your Honor. In terms of other settlements, I will represent that I'm not aware of a single settlement in which Coverwell has paid anybody, any money for a misclassification suit, for a lawsuit. There have been other lawsuits that have been filed, of course. Could you address my concern about the numbers of franchise owners who are really going to be eligible for an unconditional assignment? Yes, Your Honor. I think there's several issues. First, of course, as Ms. Lorenz said, this is available to every franchise owner. All they need to do is pay for what they want to own unconditionally. I don't think that's a unique concept in the law, but I do think there is record evidence which shows how great a percentage of the franchisees will actually benefit from this. First of all, the class definition is limited to those franchisees who perform services to the date of the preliminary approval order. That's September 19th of 2011. In the record, there's evidence, and it's from Docket 158-3, which was our opposition to the Plaintiff's Motion for Classification, that the longest that Coverwell finances any portion of a franchise fee is three years. There's a 24-month option, a 30-month option, and a 36-month option. Three years from September 19th, 2011, takes us to September 19th, 2014. Therefore, the only people who would not be getting these accounts unconditionally would have been those franchisees who purchased a franchise after September 19th, 2010, chose to finance a portion of their franchise fee, and chose to finance it for the three-year period. And as to those franchisees, it will be unconditional as of September 19th, 2014, only approximately ten months from now. I'll also add, Your Honor, that this is a turnover rate. I mean, how do we know that there haven't been people that fade out after certain – I mean, do we know those numbers that still have tenure? Well, there are people that fade in and out of the system, Your Honor, but the class definition is limited to those franchisees that provide services to account through the date of the preliminary approval order. That turnover is relevant to how many people will sustain themselves in order to be there for the full 36 months to pay it off. I agree, Your Honor, but the class numbers that are still in the system, the ones that are going to benefit, are every single one other than those few that fall into the discrete criteria that I just mentioned. But why wasn't that number simply given and put into the record? Well, there was actually no specific request for it, Your Honor. Objector's counsel knows that she specifically urged the district court to mention that, to address that, but that's really not what appears in the record. That question was never specifically raised. One other point I did want to make as it concerns the numbers that are governed by this, and that concerns the district court's findings as it concerns the named plaintiffs. Of the three named plaintiffs, the first, Sabrina Laguna, paid for her franchise in full. She would have received an unconditional assignment. Carlos Acevedo, he purchased his franchise from another franchisee. He paid in full. Therefore, he would have received an unconditional assignment. And the last one, Teresa Salas, she financed her franchise for a period of two years. She purchased in 2006. So in 2008, she would have received an unconditional assignment of everything. There was a specific finding by the district court that their claims were typical of the claims of the other class members, and that finding has not been challenged on appeal, unless the court has any further questions. I have a question. Yes, Your Honor. Just if you could elaborate for me, please, as to how this assignment works, and I guess I could figure it out from the record reviewing it later, but how does the assignment work in the context of a national franchisor who keeps, as I understood you earlier, keeps the right to receive the revenues, so that, let's say, XYZ Building Company hires a janitorial service, and Mr. Jones or Ms. Smith have that, and they clean the building. Now the company is going to pay, and as you said, they pay it to cover all. But what does the assignment mean in that context? There were two primary allegations underlying the lawsuit, Your Honor. The first was that Coverall misclassified its franchisees as independent contractors, and one of the causes of that supposed misclassification was that the franchisees did not actually own the account. It's the same allegation the Objectors' Counsel made in the lawsuit that she filed against Coverall in Massachusetts. The second was that Coverall removed franchisees from accounts so they could resell them to other franchisees, a practice that's referred to in the complaint as churning. The assignment of accounts changes that entirely, and it addresses both of those issues, because the accounts will no longer be in Coverall's name. There is going to be direct contractual privity between the franchisees and the customers. The contracts are going to be between those two entities. The only way that a franchisee will be able to lose an account now is, one, if the customer fires the franchisee, and, of course, that's something that Coverall has absolutely no control over, or, two, Coverall terminates the franchise relationship under the terms of the franchise agreement, but even that is not governed solely by the franchise agreement. That's governed by the terms of the California Franchise Relations Act, under which a franchisor needs good cause to terminate a relationship. So I think it's a fundamental change. Your Honor, the contract between janitorial franchisee and building X is now going to be owned by the janitor franchisee. Correct, Your Honor. They'll be the signatory on the contract, but is that contract going to provide that the building pays their cleaning fee to Coverall? The franchise agreement that every franchisee enters into with Coverall, Your Honor, provides that Coverall handles the billing and management services for the franchisees in exchange for a fee. That is still part of the franchise agreement. It's not part of the relationship that was challenged in the lawsuit, and it's part of the relationship that will remain going forward. Okay. I understand. Thank you. Thank you. Thank you, Mr. Leon. Thank you. If I had time, Your Honor, for one minute to correct one issue you raised. Well, I'm going to – you've now taken more than four minutes over your time. I will allow you one minute. I am going to give some additional time on rebuttal for the objector's counsel. Understood, Your Honor. Mazda, on behalf of Ares Capital Corporation, the question you asked, Your Honor, whether counsel and the parties knew when the settlement agreement was signed what the claims rate would be. The parties did not know that, and in fact, the parties thought it would be higher because in this instance it was direct notice was provided in both English and Spanish to all of the former franchise owners, and the claims rate was not 119 out of 1,500 for the monetary relief. It was 119 out of 807 former franchise owners, which, as Mr. Leon indicated, was a 15 percent claims rate, which, as this Court knows, is higher than the average claims rate, which averages about 3 to 5 percent in a normal claims-made basis. So on that basis, there's nothing in the record to support that the parties knew ahead of time. In fact, they thought it would be much higher. It did everything in their power. And finally, on the timing of the opt-out rate, opt-out provision, it was 45 days, but the judge did not, Judge Miller, did not approve the settlement until February 2012, which was another 90 days from the fairness hearing. And at the fairness hearing, the parties represented that they would allow claim forms to come in and be submitted and be paid if they were paid before final approval. So the opt-out deadline was not just 45 days. It was 90 days in addition to those 45 days for a total of close to 135 days. Thank you for your intelligence of my time here, Hunter. Let's put three minutes on the clock for rebuttal. Thank you. Thank you, Hunter. And we will adhere to the three minutes. Okay. Okay. Thank you, Hunter. Justice Gould, you cannot figure out from this record how the assignment works. If you go back and review the record, the settlement agreement contains no definition or explanation whatsoever about what an assignment is. Everything in the record about what an assignment were counsel, after the fact, trying to embellish and say, well, of course this is what assignment means. It's not in the settlement agreement. Now, what Mr. Leone just said, that the assignment, and as Loren said, that the assignment would prevent these accounts from being taken away unfairly, is also absolutely contradicted by the record because, as I said before, nothing will change. One of the main complaints that coverall franchisees have had against coverall is that coverall takes away accounts pretextually. They trump up a pretext to take the account away so they can go sell it to another worker. So their claim is often that they're taken away without cause, that they claim that the customer was upset about it. Same thing is going to happen, even under what you just heard. They say, well, the accounts can still be taken away if the customer fires the worker, which is exactly the problem we have now, that coverall says, oh, the customer wasn't happy with you, so we're going to have to take this away. They have admitted that even if there's an assignment, even if this assignment actually reaches anyone, Justice Chen, which we have no evidence in the record of how many workers would actually be eligible for this assignment, it still does not change things in that the accounts can still be taken away from them based on coverall's determination of whether or not there was just cause for the removal. There still has never been any answer in the record as to how many workers would receive the benefit of this assignment. Now, the just cause inquiry, though, would be, I mean, there are additional rules in California that would govern that. Well, that would govern any event. Is there a franchise board here? Excuse me? Is there a franchise board that looks at these things? I'm not aware of any such process. Coverall has said the process would be to go file a claim with the American Arbitration Association, which costs hundreds of dollars to start a claim, and for other reasons that are discussed briefly in the record are really quite illusory for many workers. But let me just quickly use my last minute on a couple of other things. Mr. Leone just said that workers do not pursue these claims individually, which is very interesting because, as he knows, I'm representing approximately 100 individual workers in Massachusetts in arbitration individually. Workers do pursue these claims individually. And if the Court would look at the record, exhibit, I mean, record volume 2, pages 140 to 144, coverall's franchise disclosure contains a list of cases that have been brought against it and settlements it has reached. As I said, these settlements include amounts of $30,000, $50,000 per person, including a prior case brought in California on behalf of, I think, approximately 15 workers, the Hercules v. Coverall case, which settled for an average of, I believe it was, $40,000 to $50,000 per worker. They raise the fact that in the Jannekeen case there have not been individual cases brought. That's because that case is on appeal, and the workers who are waiting to see what's going to happen with that appeal have stood back and haven't filed a case because they would still be covered by a class action should that case be reversed. And we are – that case is now pending. I represent the plaintiffs in that appeal to the Ninth Circuit. You've exceeded your time. Thank you, Your Honor. Okay. We thank both counsel for – all counsel for the argument in this case. Thank you. Jake, Judge Bybee, could we take a – could we please take a break before the bankruptcy argument? Yes. Let's – the Court will be adjourned for about ten minutes. We'll be back. All rise.
judges: Chen, Gould, Bybee